BRYAN, Judge.
 

 In August 2005, Travis C. Aderhold sued Massey Chevrolet, Inc., seeking to recover workers’ compensation benefits. Aderhold worked as a mechanic for Massey Chevrolet. In his complaint, Aderhold alleged that he had injured his neck at work on January 5, 2004, when his head struck the tire of an automobile as he attempted to exit from under the automobile. Aderhold and Massey Chevrolet subsequently entered into a settlement agreement regarding Aderhold’s workers’ compensation claim. On March 26, 2007, the trial court entered a judgment approving the settlement agreement. The settlement agreement provided that Aderhold’s “medical disability is based on injuries to his head and neck” and that Aderhold retained “any and all rights to recover future medical expenses necessary and directly related to the subject injury.” The settlement agreement also provided that “[Massey Chevrolet] does not admit, but expressly denies,
 
 *35
 
 that [Aderhold’s] disability is as serious and extensive as claimed.”
 

 On May 9, 2007, Aderhold filed a motion seeking to compel Massey Chevrolet to pay for Aderhold’s medical treatment. Aderhold’s motion asserted that Massey Chevrolet had refused to pay for medical treatment provided to Aderhold by Dr. Charles Aprill. The motion also asserted that Massey Chevrolet had refused to authorize any future treatment of Aderhold by Dr. Aprill. Massey Chevrolet filed a response to Aderhold’s motion, denying liability for any medical treatment that Ad-erhold had obtained or would seek to obtain from Dr. Aprill.
 

 On June 1, 2007, the trial court entered an order finding that Massey Chevrolet was not liable for the initial medical treatment provided by Dr. Aprill to Aderhold on January 31, 2005. That order also stated that the trial court would hold a hearing regarding Massey Chevrolet’s potential liability for “further treatment” provided by Dr. Aprill to Aderhold. Following a hearing, the trial court entered a judgment only ordering Massey Chevrolet “to fund the medical treatment prescribed and provided by Dr. Aprill.” Massey Chevrolet appealed the trial court’s judgment to this court. This court reversed the judgment, and we remanded the case to the trial court for that court to enter a judgment complying with § 25-5-88, Ala.Code 1975, which requires a workers’ compensation judgment to “contain a statement of the law and facts and conclusions as determined by [the trial] court.”
 
 Massey Chevrolet, Inc. v. Aderhold,
 
 991 So.2d 750 (Ala.Civ.App.2008).
 

 After remand, the trial court, on July 8, 2008, rendered, but did not enter, a written judgment finding that Dr. Aprill is an authorized treating physician of Ader-hold, granting Aderhold’s motion to compel medical treatment, and ordering Massey Chevrolet to continue to pay for Dr. Ap-rill’s medical treatment of Aderhold. On August 21, 2008, Massey Chevrolet prematurely filed a notice of appeal, and, on August 22, 2008, Massey Chevrolet filed a petition for a writ of mandamus. According to the State Judicial Information System, the trial court entered its judgment in favor of Aderhold on August 22, 2008; pursuant to Rule 4(a)(4), Ala. R.App. P., Massey Chevrolet’s appeal was held in abeyance until the trial court entered its judgment on that date. Because an appeal is an available remedy for Massey Chevrolet in this case, we deny the petition for a writ of mandamus.
 
 [1]
 
 “ ‘A writ of mandamus will issue only in situations where other relief is unavailable or is inadequate, and it cannot be used as a substitute for appeal.’ ”
 
 Ex parte Sawyer,
 
 892 So.2d 898, 901 (Ala.2004) (quoting
 
 Ex parte Empire Fire & Marine Ins. Co.,
 
 720 So.2d 893, 894 (Ala.1998)).
 

 Section 25-5-81(e), Ala.Code 1975, provides the standard of review in workers’ compensation cases:
 

 “(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
 

 “(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
 

 Substantial evidence is “ ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ”
 
 Ex parte Trinity Indus., Inc.,
 
 680 So.2d 262, 268
 
 *36
 
 (Ala.1996) (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)).
 

 On appeal, Massey Chevrolet first argues that the trial court erred in finding that Dr. Aprill is an authorized treating physician of Aderhold. In
 
 Overnite Transportation Co. v. McDuffie,
 
 this court stated:
 

 “Section 25-5-77(a) indicates that the employer shall make the initial choice of a physician who shall be authorized to treat the employee. The statute also provides that the employer shall be responsible for paying the costs of ‘reasonably necessary’ medical treatments for the employee. Accordingly, the employer is responsible for paying for the treatment choice made by the authorized treating physician so long as that choice falls within the parameters of what is ‘reasonably necessary’ to treat the employee.
 
 See Ex parte Southeast Alabama Med. Ctr.,
 
 835 So.2d 1042, 1046 n. 4 (Ala.Civ.App.2002). This principle has been applied repeatedly in cases in which the ‘treatment’ recommended by the authorized physician is a treatment to be administered by a second physician.
 

 “For example, in
 
 Jasper Community Hospital, Inc. v. Hyde,
 
 419 So.2d 594 (Ala.Civ.App.1982), the employee’s Alabama physician referred her to the Campbell Clinic in Memphis, Tennessee. This court concluded that the employee’s ‘treatment at the Campbell Clinic in Memphis, Tennessee was authorized by the [employer]. The record clearly indicates that Dr. Russell[, the employee’s physician,] referred her there for diagnosis and treatment. Since we have found that Dr. Russell’s treatment of [the employee] was authorized, we have no difficulty in determining that other reasonably necessary medical treatment prescribed by him was also authorized.’ 419 So.2d at 597.
 

 “To similar effect was this court’s holding in
 
 Blue Bell, Inc. v. Nichols,
 
 479 So.2d 1264 (Ala.Civ.App.1985). As this court explained:
 

 “ ‘[W]e find that the evidence would have supported a holding that the employee was given the impression that he had the authority from [the employer] to at least see Dr. Pyle, who referred him to Dr. Hatchett. Since the consultation with Dr. Pyle was authorized [by the employer], we have no difficulty in determining that other reasonably necessary medical treatment consisting of the referral of the patient to Dr. Hatchett and the subsequent hospitalization were also authorized.’
 

 “479 So.2d at 1267.
 

 “In
 
 Genpak Corp. v. Gibson,
 
 534 So.2d 312 (Ala.Civ.App.1988), the employer authorized the employee to be treated by Dr. Frank Gogan, a general practitioner.
 
 Id.
 
 Dr. Gogan admitted the employee into the hospital so that a myelogram could be performed on her.
 
 Id.
 
 The employer gave the employee the names of three doctors who it authorized to perform the myelogram.
 
 Id.
 
 at 313-14. Before the employee’s admittance to the hospital, the employer had informed both the employee’s attorney and Dr. Gogan that Dr. Jackson Bostwick was not acceptable to perform the myelo-gram.
 
 Id.
 
 at 314. In spite of the employer’s unequivocal and express refusal to authorize treatment by Dr. Bostwick, Dr. Gogan asked Dr. Bostwick to perform the myelogram on the employee, which he did.
 
 Id.
 
 at 314.
 

 “After a trial on the employee’s workers’ compensation claim, the trial court found the employee totally and permanently disabled and, among other things,
 
 *37
 
 ordered the employer to pay $805 to reimburse the employee for the treatment that Dr. Bostwick had provided to the employee.
 
 Id.
 
 at 313. On appeal, the employer argued that that award was improper because the employer had not authorized the employee’s treatment by Dr. Bostwick and, in fact, had expressly refused to authorize treatment by him.
 
 Id.
 
 This court disagreed. Citing
 
 Jasper Community Hospital
 
 and
 
 Blue Bell, Inc.,
 
 this court held as follows:
 

 “ ‘Since Dr. Gogan, the employer’s physician, admitted the employee into the hospital and subsequently requested Dr. Bostwick to perform the myelogram, we have no difficulty in determining that the myelogram performed by Dr. Bostwick was authorized.’
 

 “534 So.2d at 314.
 

 “As this court stated more recently in
 
 Ex parte Alabama Power Co.,
 
 863 So.2d 1099, 1102 (Ala.Civ.App.2003), albeit in the context of a referral for a functional capacities evaluation, ‘the [authorized treating] physician is empowered under the Act to treat the employee for so long as is reasonably necessary
 
 and to refer the employee to other medical providers for reasonably necessary treatment.’
 
 (Emphasis added.)
 
 See generally City of Auburn v. Brown,
 
 638 So.2d 1339, 1341 (Ala.Civ.App.1993) (‘We hold that, as a general rule, the employer may not dictate to the employee that he may not have the medical treatment recommended by his authorized, treating physician.’).”
 

 933 So.2d 1092,1096-97 (Ala.Civ.App.2005) (footnote omitted).
 

 In this case, Massey Chevrolet authorized Dr. Brendt Peterson, an orthopedic surgeon, as Aderhold’s initial treating physician. In June 2004, Dr. Peterson performed an anterior cervical diskectomy and fusion at the C5-6 level of Aderhold’s neck. According to Dr. Chris Nichols’s deposition testimony, Dr. Peterson referred Aderhold to Dr. Nichols for pain management in September 2004. In December 2004, Dr. Peterson suggested that a cervical diskogram be conducted on Ad-erhold to determine if additional procedures on his neck would be beneficial.
 
 [2]
 
 On January 19, 2005, Dr. Peterson made the following entry in Aderhold’s medical file: “[Aderhold] scheduled for cervical disco-gram with Dr. Aprilfl] in New Orleans on 01-31-05 scheduled per W/C.” Aderhold visited Dr. Aprill on January 31, 2005; however, Dr. Aprill did not perform a cervical diskogram on Aderhold on that date. Instead, Dr. Aprill administered facet injections to Aderhold’s neck and performed a CT scan. Dr. Aprill treated Aderhold several times after this initial visit, performing facet injections and radiofrequen-cy denervation procedures designed to reduce Aderhold’s pain. It is unclear from the record on appeal how many times Dr. Aprill has treated Aderhold.
 

 While Dr. Aprill was treating Aderhold, Dr. Nichols, the physician to whom Dr. Peterson had referred Aderhold for pain management, treated Aderhold for pain by prescribing various medications. On January 29, 2007, Dr. Nichols made the following treatment notes regarding Aderhold:
 

 “Mr. Aderhold is here again. I have a note from Dr. Dumitrescu who works with Charles Aprill in New Orleans. They apparently performed a right C4-5, 5-6, 6-7, 7-T1, and a left C7-T facet
 
 *38
 
 joint injection. Of course his pain was down to 7 out of 100 from 50 out of 100.
 
 Mr. Aderhold wants to go on through with whatever treatment they recommend. I told him certainly at this point.
 

 “...
 
 [Aderhold] may get some measure of relief from any injection or radio-frequency procedure but I don’t know if it is going to reduce any medication usage or any other behavior. ... I am not sure what else to recommend.
 
 I cannot wholeheartedly recommend continuous procedures in his neck.
 
 I think it is somewhat in the nature of beating a dead horse[.] I am not sure if Dr. Petersen thinks it is valuable and [I will] maybe revisit that with him but I will continue his medications]. I don’t know what else to do for further treatment at this point. In regards to injections I have outlined my thoughts above. I have explained to him and the case manager that I cannot see that he is getting great relief unless he is taking less medicines and in fact he wanted something more for headaches today.
 
 So, I am not sure that anything else needs to be done.
 
 It has not been useful in any objective way other than [Aderhold’s] subjective decreased complaints for a period of time but he seems to always have neck pain and headaches .... ”
 

 (Emphasis added.)
 

 In his deposition testimony dated August 2, 2007, Dr. Nichols discussed his and Dr. Aprill’s treatment of Aderhold for pain management:
 

 “[Aderhold will] get some measure of relief he’ll report [from receiving the facet injections from Dr. Aprill], but it won’t ever be permanent and sometimes [the relief lasts] a week, sometimes it [lasts] days. And so what[] it [has] boiled down to is everyone wants to know do we keep doing these shots [provided by Dr. Aprill], do we keep providing these things? And what I finally said and what I believe is [this:] great, if you get a year or six months of relief and you come and tell me hey, you know, they did this thing in my neck and it’s better, I don’t have to take your Lortab or your Oxycontin, but that has not happened once.
 

 “So I have to have some reason to say something’s better, the patient is saying it. What I can say is Mr. Aderhold always is wanting some medicine and he’ll get a little window of relief with one of these injections by somebody and think that he needs to get more, then we can do that if he got some permanence.
 

 “But I haven’t ever seen any decrease in medicine usage, or I could fully recommend hey, go get some more of those [facet injections], you are doing good, you are not taking as much medicine, you look better, your posture is better. But I haven’t seen any clinical improvement that I can measure and I haven’t seen any medication decrease, so it’s hard for me to keep recommending injections or even radio frequencies or whatever in anyone’s neck because there’s danger with those, you can have complications with those. Unless there’s a huge benefit, you don’t need to keep doing that. You are going to one day hit something, one day get an infection the more of those you do, and I tried to explain that to Mr. Aderhold, but we go in vicious cycles.
 

 “And I can’t, you know, basically recommend a lot more — you know, a lot more procedures or intervention because I think you’re running a risk of side effects and detriment[.] Mr. Aderhold, I understand his problem, he’s got a bad neck and pain but we’re just trying to
 
 *39
 
 help him and not harm him. I think we are going to end up harming him if anything else is done to him.
 

 “So at this point ... I’m happy to provide medicines if it makes his situation more comfortable and that’s where our treatment has kind of went. Mr. Aderhold wants injections, he’s been promised he can be pain free by [Dr. Aprill and his associate]....
 

 “And there’s no way you get permanent relief with those, you get some relief but you got to measure it some way. [Dr. Aprill and his associate] are doing the procedure, they are not measuring anything. I’m the one seeing the patient on a chronic basis. And I can’t measure any improvement any kind of way, so
 
 I can’t keep recommending treatment over and
 
 over—
 

 “Q. And you’re—
 

 “A.
 
 •
 
 — at
 
 this point.
 

 “...
 
 [C]an [you] state to a reasonable degree of medical certainty that you don’t believe that an injection at that level
 
 [3]
 
 is going to provide him any major benefit or long-term benefit?
 

 “A. So far it hasn’t. He’s had some ... radio frequency procedures where they burn nerves. And that’s what I said, I’d get him burned at every level up and down his neck if he came back and said man, it’s doing so good, I don’t have to take Lortab as much or something like that.
 

 “Q. Or decrease the Lortab?
 

 “A. But he never has. ... I have to have a reason to say okay, it’s working. ... It hasn’t worked clinically and there’s no measurable benefit.
 

 “Q. And that was the purpose for you and/or Dr. Petersen to refer him to Dr. April[l] and his associates over in New Orleans for a benefit, correct?
 

 “A. Well, what we are trying to do is get rid of his pain first, if we can, if the procedure works. I’m not talking about it working for a week or three weeks or four weeks or two months[;] if it works for a year or eight months or three years, that’s what we’re talking about and we’ve not seen anything work very long.
 

 “And then we are asked well, Doctor, do you recommend this and I’d be like I would wholly recommend it and I recommend it every day for patients that get relief and they get relief and don’t see me for a year after one of those dener-vations and [they] say man, I need it again. I’m fine, get another one. But that’s not been the case at all with Mr. Aderhold. I have not seen him — I haven’t seen any relief.
 

 “... [The treatment being provided to Aderhold by Dr. Aprill is] not working!;] that’s my opinion. It’s not providing any long-term benefit. It gives him some short window of relief ....
 

 “But you have to understand the side effects that could happen. You can’t keep burning these nerves and doing these shots in someone’s neck for two weeks of relief.
 
 The risk benefit ratio is much against Mr. Aderhold, and I can’t recommend that
 
 as
 
 a physician.”
 

 (Emphasis added.)
 

 The record indicates that Dr. Peterson, Aderhold’s original treating physician, referred Aderhold to Dr. Aprill for a cervical diskogram in January 2005; Dr. Peterson did not refer Aderhold to Dr. Aprill for
 
 *40
 
 pain-management treatment. Instead, Dr. Peterson referred Aderhold to Dr. Nichols for pain-management treatment beginning in September 2004. However, the record further indicates that Dr. Nichols subsequently recommended some pain-management treatment provided by Dr. Aprill to Aderhold in the hope that that treatment would provide him pain relief. At some point, however, Dr. Nichols determined that Dr. Aprill’s treatment of Aderhold was not sufficiently benefiting Aderhold; consequently, Dr. Nichols determined that he could no longer recommend that treatment. It is unclear from the record precisely when Dr. Nichols withdrew his recommendation of Dr. Aprill’s treatment of Aderhold. According to Dr. Nichols’s treatment notes, as early as January 29, 2007, Dr. Nichols doubted the usefulness of Dr. Aprill’s treatment of Aderhold and noted that he could no longer “wholeheartedly recommend continuous procedures” by Dr. Aprill. On that same date, however, Dr. Nichols told Aderhold that he could continue to receive treatment from Dr. Aprill “at [that] point.” In his deposition testimony of August 2, 2007, Dr. Nichols opined that Dr. Aprill’s treatment was providing only short-term pain relief for Ader-hold and that the risks of that treatment outweighed any short-term pain relief. Dr. Nichols then concluded that he could no longer recommend Dr. Aprill’s pain-management treatment. Therefore, the record suggests that Dr. Nichols had withdrawn his recommendation of Dr. Aprill’s treatment of Aderhold by August 2, 2007, at the latest.
 

 As we have noted,
 

 “[t]he employer is responsible for paying for the treatment choice made by the authorized treating physician so long as that choice falls within the parameters of what is ‘reasonably necessary5 to treat the employee. ... This principle has been applied repeatedly in cases in which the ‘treatment’ recommended by the authorized physician is a treatment to be administered by a second physician.”
 

 Ovemite Tramp.,
 
 933 So.2d at 1096. Dr. Peterson, Aderhold’s original treating physician, referred Aderhold to Dr. Nichols for the specific purpose of providing Aderhold pain-management treatment. Accordingly, Dr. Nichols was implicitly authorized to control Aderhold’s pain-management treatment. The record indicates that Dr. Nichols maintained control over Aderhold’s recovery as it related to pain management and, as a part of this recovery, recommended that Aderhold obtain some pain-management treatment from Dr. Aprill. Because Dr. Nichols had been implicitly authorized to provide pain management to Aderhold, Dr. Aprill’s pain-management treatment was in turn implicitly authorized
 
 insofar as that treatment was recommended by Dr. Nichols.
 
 As noted, however, it is unclear precisely when Dr. Nichols withdrew his recommendation of Dr. Aprill’s pain-management treatment.
 

 In its judgment, the trial court found that Dr. Aprill was an authorized physician, and it ordered Massey Chevrolet “to continue to pay for the treatment” provided by Dr. Aprill to Aderhold. We hold that the pain-management treatment provided by Dr. Aprill to Aderhold was authorized only insofar as that treatment was recommended by Dr. Nichols, the authorized physician in charge of Aderhold’s pain-management treatment. Accordingly, we reverse the judgment of the trial court, and we remand the case for the trial court to determine which of Dr. Aprill’s pain-management treatments were in fact recommended by Dr. Nichols.
 

 Our decision today does not conflict with this court’s decision in
 
 City of Auburn
 
 
 *41
 

 v. Brown,
 
 638 So.2d 1339 (Ala.Civ.App.1993). In
 
 City of Auburn,
 
 the employee, following his back injury, was initially treated at a family-care center.
 
 Id.
 
 at 1339. The employee was then referred to a neurosurgeon, who recommended surgery.
 
 Id.
 
 at 1339-40. The employer subsequently authorized two other neurosurgeons to treat the employee; neither of those neurosurgeons recommended surgery.
 
 Id.
 
 at 1340. The employee expressed a desire to undergo the surgery, but the employer would not approve the surgery.
 
 Id.
 
 Given those facts, this court held “that, as a general rule, the employer may not dictate to the employee that he may not have the medical treatment recommended by his authorized, treating physician.”
 
 Id.
 
 at 1341.
 

 “City of Auburn,
 
 stands for the proposition that when two qualified physicians, each of whom is authorized by the employer, recommend two different treatments, each of which can be considered a reasonably necessary treatment for the employee’s condition, an employer cannot dictate which physician, and thereby which treatment, must be chosen. The choice between physicians in this circumstance belongs to the patient.”
 

 Ex parte Southeast Alabama Med. Ctr.,
 
 835 So.2d 1042, 1048 (Ala.Civ.App.2002).
 

 Each of the three neurosurgeons in
 
 City of Auburn
 
 were authorized to control the course of the employee’s recovery; the employee in that case could have chosen any reasonably necessary treatment prescribed by any of those three physicians. By contrast, in this case, the record does not indicate that Dr. Aprill was authorized to control the course of Aderhold’s pain-management treatment. Dr. Aprill’s authorization to provide pain-management treatment to Aderhold derived solely from Dr. Nichols’s limited recommendation of that treatment. Dr. Nichols did not yield control of Aderhold’s recovery to Dr. Ap-rill in this case. Instead, Dr. Nichols permitted Aderhold to obtain some pain-management treatment from Dr. Aprill in the hope that that treatment would benefit Aderhold’s recovery. When Dr. Nichols determined that Dr. Aprill’s treatment was compromising Aderhold’s recovery, Dr. Nichols concluded that he could no longer recommend that treatment. Given these facts, we conclude that, unlike the three neurosurgeons in
 
 City of Auburn,
 
 Dr. Nichols and Dr. Aprill are not on equal footing regarding their roles in Aderhold’s treatment.
 

 Massey Chevrolet also argues that, even if Dr. Aprill is an authorized physician, the trial court erred by requiring Massey Chevrolet “ ‘to pay for the treatment [provided by] Dr. Aprill,’ regardless of whether that treatment meets the requirements of the Alabama Workers’ Compensation Act[, § 25-5-1 et seq., Ala.Code 1975].” Massey Chevrolet’s brief at 18-19. More specifically, Massey Chevrolet argues that the trial court’s judgment ignores Massey Chevrolet’s right to challenge the reasonable necessity of Dr. Aprill’s treatment through the utilization-review process.
 
 See
 
 § 25-5-293(g) and (k), Ala.Code 1975; and Rule 480-5-5-.01 et seq., Ala. Admin. Code (Alabama Dep’t of Indus. Relations).
 

 “[A]n employer may refuse to pay for treatment of an employee by a physician to whom the employee has been referred on the ground that that treatment is not ‘reasonably necessary’ if it does so pursuant to a utilization review or medical-necessity determination conducted in accordance with the regulations contemplated by § 25-5-293(k).”
 

 Ovemite Transp.,
 
 933 So.2d at 1098 n. 4. We have determined that the pain-management treatment provided by Dr. Aprill to Aderhold was implicitly authorized inso
 
 *42
 
 far as that treatment was recommended by Dr. Nichols. We do not read the trial court’s judgment as purporting to preclude Massey Chevrolet from exercising its right to dispute, through the utilization-review process, the reasonable necessity of Dr. Aprill’s treatment recommended by Dr. Nichols; Massey Chevrolet possesses that right.
 

 Massey Chevrolet also ai'gues that, even if Dr. Aprill provided authorized treatment to Aderhold, portions of that treatment were unrelated to the injury caused by Aderhold’s accident at work on January 5, 2004. In other words, Massey Chevrolet contends that Dr. Aprill provided treatment to Aderhold for an injury that was not medically caused by his accident.
 

 “ ‘For an injury to be compensable, it must be “caused by an accident arising out of and in the course of’ the employee’s employment. § 25-5-51, Ala.Code 1975. The phrase “arising out of’ an employee’s employment requires a causal connection between the injury and the employment. ... In accidental cases, i.e., those involving a sudden and traumatic event, an employee must ... establish medical causation by showing that the accident caused or was a contributing cause of the injury.’ ”
 

 Page v. Cox & Cox, Inc.,
 
 892 So.2d 413, 417 (Ala.Civ.App.2004) (quoting
 
 Pair v. Jack’s Family Rests., Inc.,
 
 765 So.2d 678, 681 (Ala.Civ.App.2000)).
 

 As noted, Dr. Peterson performed an anterior cervical diskectomy and fusion at the C5-6 level of Aderhold’s neck. Massey Chevrolet notes that Dr. Nichols observed that Dr. Aprill has provided treatment to levels of Aderhold’s neck other than the C5-6 level. Massey Chevrolet contends that Aderhold has not established that his accident at work caused any injury to the levels of his neck other than the C5-6 level. The medical evidence in the record indicates that Aderhold had degenerative disk disease and facet-joint arthropa-thy,
 
 i.e.,
 
 a joint disease, in his neck before his accident. The medical evidence also indicates that Aderhold did not have a history of neck pain before his accident.
 

 In his deposition testimony dated October 18, 2006, Dr. Aprill discussed whether Aderhold’s accident had contributed to the neck condition for which Dr. Aprill had been providing treatment. Dr. Aprill testified:
 

 “Q. If we assume that he was gainfully and regularly employed as an auto mechanic for this 25-year history, not only in that field but with the same employer for that time period, has this injury and now all of these symptoms follow and assuming that what you were told was correct that he does not have a prior history of neck problems, is it more likely than not that that was the precipitating event for his current symptoms?
 

 “A. ... [I]t would seem more likely than not that this was a precipitating event that started off a downward spiral which symptomatically continues to date. I just don’t know — I can’t blame all of the pathology on the blow to the head. But if he’s not had neck symptoms before, I believe he certainly does now; and I have no reason not to believe that the man is having considerable problems with his neck now. And I would have to say that it seems more likely than not that they were precipitated by this incident.
 

 “Q. So that’s your basis for saying that you cannot state with any reasonable degree of medical probability that all of his symptoms are attributed to this accident of January 5, 2004?
 

 
 *43
 
 “A. That’s correct. I can say with some degree of confidence that the pathology that we see, the facet joint ar-thropathy, did preexist his hitting of his head. But if he’s not been seeing physicians, with somebody complaining of pain prior to that, one would have to assume that this was asymptomatic ar-thropathy, which does occur and it occurs commonly.
 

 “Q. But you don’t know whether it would have become—
 

 “A. I can’t say. I don’t believe that you can say whether this, would become symptomatic in the future or not. It is now, and there is the incident that occurred from a temporal point of view one would think that there’s a cause- and-effeet relationship.
 

 “Q. With regard to his condition and you said it’s very safe to assume that there was a degenerative process ongoing before his injury in January of ’04, can and sometime does an injury accelerate a degenerative process in someone?
 

 “A. That’s not the word I would use. Yes, it can. But more commonly, injury can affect segments that are undergoing degeneration simply because they’re more vulnerable. I don’t believe it necessarily accelerates the process. It can convert an asymptomatic situation to a symptomatic situation because the components are vulnerable to injury because they’re not normal.”
 

 Dr. Aprill’s testimony constitutes substantial evidence indicating that Aderhold’s accident of January 5, 2004, contributed to his neck injury treated by Dr. Aprill. Accordingly, the trial court did not err in finding that Aderhold established medical causation regarding that injury.
 

 The pain-management treatment provided by Dr. Aprill to Aderhold was authorized only insofar as that treatment was recommended by Dr. Nichols. Accordingly, we reverse the judgment of the trial court, and we remand the case for the trial court to determine which of Dr. Aprill’s pain-management treatments were in fact recommended by Dr. Nichols. The trial court’s judgment does not preclude Massey Chevrolet from exercising its right to challenge, through the utilization-review process, the reasonable necessity of any medical treatment obtained by Aderhold through an authorized physician. The trial court had before it substantial evidence indicating that Aderhold’s accident of January 5, 2004, medically caused the neck injury for which he was treated by Dr. Aprill. Because an appeal is an available remedy for Massey Chevrolet in this case, we deny Massey Chevrolet’s petition for a writ of mandamus.
 

 2071082 — PETITION DENIED.
 

 2071089 — REVERSED AND REMANDED WITH INSTRUCTIONS.
 

 THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
 

 MOORE, J., concurs in the result, without writing.
 

 [1]
 

 . After remand, the trial court assigned this case a new docket number, CV-05-3116.80. The trial court had previously assigned this case the docket number CV-05-3116.51. Those two docket numbers designate the same case.
 

 [2]
 

 . A diskogram is a "radiograph of an inter-vertebral disk."
 
 Dorland’s Illustrated Medical Dictionary
 
 545 (30th ed.2003).
 

 [3]
 

 3. It is unclear from the selected portions of Dr. Nichols's deposition testimony contained in the record what level of Aderhold's neck this question refers to.